UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAVID G. STERN,              )<br>                                      )<br>         Petitioner,           )<br>                                      )   Civ. Action No. 04-CV-10465-NG<br>         v.                   )<br>                                      )<br>DAVID L. WINN,                )<br>                                      )<br>         Respondent.          )<br>                                      ) | |

## RESPONDENT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

### INTRODUCTION

Petitioner, David Stern ("Stern"), an inmate at Federal Medical Center Devens ("FMC Devens"), brought this suit challenging the legality of a new policy of the Bureau of Prisons ("BOP") regarding eligibility for placement in Community Corrections Centers ("CCC") at the end of a prisoner's sentence. For the reasons stated below, the Complaint fails to state a claim upon which relief can be granted and therefore must be dismissed.

### STATEMENT OF FACTS[1]

After he was found guilty by a jury of fifteen counts of mail fraud and two counts of wire fraud, in connection with defrauding one of his former clients out of $450,000, Stern, a disbarred lawyer, was sentenced, by this Court, on September 25, 2002, to, among other things, a term of imprisonment of 30 months. Declaration of Patrick Ward ("Ward Dec."), Exs. B and C. Petitioner alleges that he reported to FMC Devens on January 6, 2003, at which time he

---

[1] In accordance with the standard of review upon a motion to dismiss, the factual allegations of the complaint are accepted as true for purpose of this motion. See Rockwell v. Cape Cod Hosp., 26 F.3d 254, 255 (1st Cir. 1994).

commenced serving his sentence. Complaint ¶ 8. He also alleges that based on the general practices of the BOP, the information provided in the Admission and Orientation Inmate Handbook, and the past practices at FMC Devens that he should be released to a CCC six months prior to his release date. Complaint ¶¶ 10-14.

Prior to December 2002, it was the policy of the BOP, as expressed in an Inmate Handbook and a BOP document entitled Program Statement Number 7310.04 (December 16, 1998), that it could consider inmates for placement in a CCC for more than the last ten percent of an inmate's term of imprisonment or more than six months of the sentence, if appropriate. Stern alleges that "as a result of the prior policy and practice of transferring inmates to a CCC for six (6) months placement the Petitioner has obtained employment with a Company in Newport, Rhode Island which could commence immediately upon his transfer to a half-way house." Complaint ¶ 21. Stern neglects to mention that this "employment" is with a company that he owns, that he runs out of his primary residence, and that he worked for this company before going to prison. See Ward Dec at Ex. J; see generally, Stern's Pre-Sentence Report from United States v. Stern, CR-01-10266.

On December 13, 2002, the Office of Legal Counsel ("OLC") of the United States Department of Justice issued an opinion concluding that the Federal Bureau of Prisons' ("BOP") former policy of initially designating to CCCs certain defendants sentenced to terms of imprisonment was inconsistent with 18 U.S.C. §§ 3621, 3624(c), and the U.S. Sentencing Guidelines ("the Guidelines") and therefore unlawful. (A copy of the memorandum can be found at: http://www.usdoj.gov/olc/bopimprisonment2.htm). This opinion ("OLC Memorandum") also indicated that the BOP's past practice of transferring offenders to CCCs for

a period exceeding the time limit specified in 18 U.S.C. § 3624 (c) (the last ten percent of the term of imprisonment, not to exceed six months) was in violation of 18 U.S.C. § 3624(c) and thus impermissible. See id. at 7 n.6. By memorandum dated December 20, 2002, the Department of Justice advised the Director of the BOP that the BOP should conform its practices with the law as described in the OLC Memorandum (attached hereto as Exhibit B).

Stern alleges that under the pre-December 2002 BOP policy he could be considered for placement in a CCC as early as September 9, 2004, six months before his statutory release date. In contrast, under the new policy his CCC placement is limited to the last ten percent of his sentence; hence the earliest he might be placed in a CCC is December 21, 2004. Complaint ¶¶ 19-20. The BOP has consistently told Stern that the earliest that he will be released to a CCC is the ten percent date of December 21, 2004. For example, Stern's August 5, 2003, Program Review Report, states that any recommendation for placement in a CCC would be reviewed within 11-13 months of his release date. Declaration of Patrick Ward ("Ward Dec.") at Ex. G (Program Review Report, 8/5/2003). The next Program Review Report, dated January 27, 2004, estimates that the Plaintiff's placement in a CCC to commence on December 21, 2004, marking the beginning of the final 10% of his prison sentence. Ward Dec. at Ex. I (Program Review Report, 1/27/2004). Stern signed these Program Review Reports. Id. at Exs. G and I.. There is no evidence that Stern was ever told that he would spend the last 6 months of his sentence in a CCC. To the contrary, he was told he would only be placed in a CCC for the last 10% of his sentence, if "approved."

Petitioner admits that he has not exhausted his administrative remedies, instead arguing that to do so would be futile. Complaint ¶ 24. However, Petitioner's desired release date to a

CCC is nearly 6 months away and therefore it is neither impractical, nor futile for him to exhaust his administrative remedies.

Stern asserts that the new BOP policy violates his rights under the Ex Post Facto and Due Process clauses of the United States Constitution, was established in violation of the notice and comment requirements of the Administrative Procedures Act ("APA"), and is wrong as a matter of statutory interpretation. Invoking jurisdiction under, <u>inter</u> <u>alia</u>, 28 U.S.C. § 2241, he seeks a writ directing Defendant to designate him to a CCC on September 9, 2004, or as soon as practicable thereafter.

## **ARGUMENT**

At the outset, it must be noted that this is a case in which a disbarred lawyer was sentenced to a 30-month term of imprisonment for multiple convictions stemming from defrauding one of his former clients. He was not sentenced to CCC confinement, either explicitly or as part of any recommendation. He was not at the cusp between probation and incarceration. He did not plead guilty on some expectation that he would serve some or all of his sentence in a CCC. He was not already in a CCC when he was informed that CCC confinement applied only to last 10% of his sentence. Instead, after jury trial he was found guilty and sentenced to imprisonment. During that term of imprisonment, he has been consistently informed that he is only eligible for CCC confinement during the last 10% of his sentence.

I.   **PETITIONER HAS FAILED TO STATE A CLAIM.**

A.   **The New BOP Policy Is a Correct Application of the Law.**

In this case, the relevant statute, 18 U.S.C. §3624(c), provides in pertinent part:

> **Pre-release custody.** The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of

> imprisonment spends a reasonable part, <u>not to exceed six months,</u> of the last ten per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community. The authority provided by this subsection may be used to place a prisoner in home confinement.

(emphasis added). Section 3624(c) thus sets an unambiguous limit on the amount of time that a prisoner may spend in a CCC at the end of his "term of imprisonment" – the last ten percent of the sentence, not to exceed six months. Therefore, were the BOP to place a prisoner into community confinement pursuant to section 3624(c) for more than the last ten percent or in excess of six months of the prisoner's sentence, the BOP would be in violation of the plain language of the statute.

Any contention that section 3624(c) is subject to a broader authority granted by 18 U.S.C. §3621(b) cannot be squared with the plain meaning of section 3624(c) and elemental rules of statutory construction. This latter section grants the BOP the exclusive authority to "designate the place of the prisoner's imprisonment." It further provides that the BOP "may designate any available penal or correctional facility that meets the minimum standard of health and habitability established by the Bureau . . . that the Bureau determines to be appropriate and suitable. . . ." Stern appears to argue, by citing <u>Monahan v. Winn</u>, 276 F.Supp.2d 196 (D. Mass. 2003), that a "penal or correctional facility" includes a CCC.

However, it cannot be true that section 3624(c) unambiguously limits placement in a CCC to the shorter of six months or the last 10 percent of the prisoner's term, and also be the case that section 3621(b) allows placement in a CCC at any time during the prisoner's sentence. Such an interpretation would effectively render section 3624(c) a nullity.

It is well settled that a provision of a statute will not be read in a way that renders another

provision of the same statute superfluous. Duncan v. Walker, 533 U.S. 167, 174 (2001). Moreover, "it is a basic principle of statutory construction that a specific statute . . . controls over a general provision. . . ." HCSC-Laundry v. United States, 450 U.S. 1, 6 (1981). While section 3624(c) is quite specific about placement of offenders in CCCs, section 3621(b) is general.

In Monahan, this Court took a different view, albeit when confronted with a different factual predicate. There, this Court concluded that sections 3621(b) and 3624(c) accomplished separate and ostensibly compatible objectives: section 3621(b) *allows* the BOP to designate a prisoner to a CCC at any time, while section 3624(c) requires the BOP to "assure" that the prisoner spends the last part of his sentence (10 percent, not to exceed six months) under pre-release conditions. 276 F.Supp.2d at 210-211 & n.11. However, this view ignores the fact that the directive of section 3624(c) is a qualified one and does not mandate any pre-release placement or give rise to an enforceable right on the part of the prisoner. See United States v. Restrepo, 999 F.2d 640, 645 (2d Cir. 1993) ("the statute does not on its face require the Bureau to ensure that all prisoners participate in such a program, but only to do so if practicable."); United States v. Loughlin, 933 F.2d 786, 789 (9th Cir. 1991) ("Nothing in the language of section 3624(c) mandates that all prisoners pass through a community treatment center en route to free society."). Therefore, the nature of the "discretion" that this Court in Monahan would have the BOP exercise under section 3621(b) is for all practical purposes identical to that exercised under 3624(c) – the only difference being the temporal limit on CCC placement. Thus, the distinction makes no practical sense. In addition, there is no suggestion of congressional intent to authorize two analytically separate but practically redundant systems for administering community confinement. In sum, section 3624(c) is clear enough in imposing a temporal limitation on

community confinement.

The legislative history also supports the conclusion that the BOP may not designate an inmate serving a term of imprisonment to a CCC except as expressly authorized by section 3624(c). Section 3581(a) of Title 18 U.S.C. provides that a person found guilty of any offense "may be sentenced to a term of imprisonment." In drafting this section, the Senate Judiciary Committee did not follow a recommendation which would have precluded imprisonment for persons committing the lowest class of crimes. In the bill submitted to the Senate floor (later enacted), every offense under the Act could lead to a term of prison. S. Rep. at 113, reprinted in 1984 U.S. Code Cong. & Ad. News at 3297. In justifying this provision, the Committee noted that "the shock value of a brief period in prison may have significant special deterrent effect." Id. at 114 (1984 U.S. Code Cong. & Ad. News at 3297). The Committee added that "[a] sentence imposed by a judge pursuant to section 3581 will represent the actual period of time that the defendant will spend in prison[.]" Id. at 115 (1984 U.S. Code Cong. & Ad. News at 3298). Thus, in considering and voting on the Senate bill, the Committee apparently did not contemplate that an offender sentenced to "imprisonment" would be incarcerated in any facility other than a prison, even if he committed only a minor infraction.

Respondent also respectfully suggests that, contrary to the Court's view in Monahan, section 3621(b) does not establish a broad discretion in the BOP to place a prisoner in a CCC at any time during the prisoner's term of imprisonment. Before the Sentencing Reform Act of 1984, 18 U.S.C. §4082(b), the predecessor to §3621(b), clearly gave the Attorney General authority to place a prisoner in a CCC. It provided in part that the Attorney General "may designate as a place of confinement any available, suitable, and appropriate institution or facility.

. . ." 18 U.S.C. §4082(b) (1982).  Subsection (f) of §4082 provided, "As used in this section – the term 'facility' shall include a residential community treatment center."  When the law governing the BOP's designation authority was rewritten in 1984, Congress did three things.  First, it added the modifying words "penal or correctional," so that now the BOP, under the new §3621(b), "may designate any available <u>penal or correctional</u> facility. . ."  (Emphasis added).  Second, Congress stripped the definition "facility" from the new section 3621.  Finally, a new section, 3624(c), was added to create an express, but carefully circumscribed, authority in the BOP to place a prisoner in a CCC for the last ten percent, not to exceed six months, of the prisoner's term of imprisonment.  The best explanation for these statutory changes is that Congress intended to modify the BOP's traditional authority by limiting the authority to place a prisoner in a CCC.

This conclusion is also consonant with the larger scheme of the Sentencing Reform Act.  Placement of an offender in a CCC is expressly authorized as a condition of probation.  18 U.S.C. §3563(b).  It is also authorized as a condition of supervised release.  <u>See</u> <u>United States</u> v. <u>Bahe</u>, 201 F.3d 1124 (9th Cir. 2000).  It is not authorized as a permissible part of a term of imprisonment.  <u>See</u> 18 U.S.C. §§3581, 3582.  The Sentencing Guidelines, which are a congressionally-authorized implementation of the Sentencing Reform Act and thus entitled to substantial deference, parallel this scheme.  They clearly indicate that "imprisonment" does not include placement in a CCC.  <u>See</u> <u>United States</u> v. <u>Cintron-Fernandez</u>, 356 F.3d 340 (1st Cir. 2004).

Further, four recent decisions in this District Court on the same point raised here, the propriety of transfer to a CCC for the last six months of a sentence when that exceeds 10% of the

sentence, support the application of the plain language and meaning of section 3624(c).  In Kennedy v. Winn, 03-CV-10568-MEL (Lasker, J.) (D.Mass. July 9, 2003), the defendant, who had been sentenced to 21 months in prison, sought relief in federal district court for placement into a community confinement center six months prior to his release date.  In that case, Judge Lasker found that section 3624(c) was the controlling statute and that the petitioner was correctly denied placement into a halfway house for the last six months of his sentence because that would have exceeded the maximum 10% period of CCC confinement prescribed in 3624(c).  Kennedy at 4-5.

An opinion by Judge Stearns in Rothberg v. Winn, 03-CV-11308-RGS (D.Mass. Oct. 10, 2003) reinforces that the current BOP interpretation of section 3624(c) is correct.  The Petitioner in Rothberg was also challenging the timing of his end-of-sentence placement into a CCC.  In dismissing the complaint,  Judge Stearns found that section 3624(c) is controlling, and further stated that the BOP's prior interpretation of section 3624(c) was a mistake.  Id., at 2.  Accord, United States v. Mikutowicz, 2003 WL 21857885 (D. Mass. August 6, 2003) (Zobel, J.).

A more recent opinion by Chief Judge Young in Goldings v. Winn, 03-CV-40161-WGY (D.Mass. Oct. 23, 2003), appeal docketed, No.. 03-2633 (1st Cir. argued May 7, 2004), adopted the Rothberg and Kennedy courts interpretation of section 3624(c).  In dismissing the Petitioner's complaint, Judge Young found that the BOP had simply corrected an erroneous interpretation of section 3624(c) and, therefore, there was no constitutional or statutory violation. Goldings at 2.  This decision was expressly followed by Judge Harrington in dismissing the

subsequent case of Turano v. Winn, 03-CV-40188-EFH (D.Mass. Jan. 7, 2004).[2]

To the extent Stern asserts that CCCs are equivalent to any penal or correctional facility, thus attempting to implicate section 3621(b), his argument must fail. His case involves the issue of whether it is correct to allow a prisoner to serve more than ten percent of the end of the sentence in a halfway house, thus contravening the plain language of § 3624(c). Thus, Stern's case is akin to Kennedy, Rothberg, Goldings and Turano, and should be dismissed. See also United States v. Cintron-Fernandez, 356 F.3d 340, 347-48 (1st Cir. 2004)(Under Sentencing Guidelines, minimum term of "imprisonment" may not be satisfied by community confinement or home detention).

The weight of authority in end of sentence cases is with the government. To be sure, this Court's decision in Monahan would appear to speak to at least some of these end-of-sentence issues, and thus must be addressed. Unlike the defendants before the Court in Monahan, this case involves no sentencing to CCC, no movement from a CCC to a prison, no expectations about sentencing being "radically upended," and no broken promises about the duration of CCC confinement. Therefore, this case arrives on a very different factual footing than those dealt with in Monahan. Of the defendants treated in the Monahan decision, the closest one to Stern factually was Julio Pereira, who the court described as part of a group of "individuals approaching the end of their imprisonment terms who had been designated for community confinement pursuant to longstanding policy only to have their designations abruptly changed." Id. at 203. As to Pereira, the Court declined to issue any injunction requiring that he serve the

---

[2] Copies of the slip opinions in Kennedy v. Winn, Rothberg v. Winn, Goldings v. Winn, et al., and Turano v. Winn are attached hereto as Exhibits A, B, C and D.

last 6 months (as opposed to the last 10 percent) of his sentence in a CCC. Just like the Court may have ultimately found with respect to Pereira, Stern has never been told anything other than that he will be sent to a CCC for the last 10 percent of his sentence.

The plain language of the statute, its legislative history, and the case law on end-of-sentence cases demonstrate that section 3624(c) is controlling, and that the BOP has correctly applied the law. The BOP's calculation of the Plaintiff's release date to a CCC is in accordance with the OLC Memorandum and section 3624(c). Thus, the Plaintiff's claims should be dismissed.

B.     **The BOP's Change In Policy Does Not Violate the Administrative Procedure Act**.

Plaintiff's claim that the new BOP policy was made in violation of section 553 of the Administrative Procedure Act ("APA") is without merit. Section 553 of the APA requires that new agency rules be made subject to a period of notice and comment. 5 U.S.C. § 553. The notice and comment provisions apply only to substantive or legislative rules; they do not apply to "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." Lincoln v. Vigil, 508 U.S. 182, 196 (1993)(citing 5 U.S.C. § 553 (b)).

Courts have defined the distinction between interpretive and legislative rules as a matter of operation. Legislative rules operate to create obligations that are not already outlined in the general statute. Warder v. Shalala, 149 F. 3d 73, 80 (1st Cir. 1998). Interpretive rules, on the other hand, operate to interpret and "advise the public" on the agency's understanding of the statutes and rules that it administers. Shalala v. Guernsey Memorial Hospital, 514 U.S. 87, 99-100 (1995).

Several courts have deemed similar BOP program statements as "interpretive" rules that

11

are not subject to notice and comment.  See Reno v. Koray, 515 U.S. 50, 60-61 (1995)("It is true that the Bureau's interpretation appears only in a Program Statement-- an internal agency guideline--rather than in published regulations subject to the rigors of the Administrative Procedure Act, including public notice and comment.  But BOP's internal agency guideline, which is akin to an interpretive rule that does not require notice and comment, is still entitled to some deference, since it is a permissible construction of the statute."); Gunderson v. Hood, 268 F.3d 1149, 1154 (9th Cir. 2001); see also Fonner v. Thompson, 955 F. Supp. 638 (1997) (BOP guideline defining the possession of a firearm as a violent crime is an interpretive rule).  Thus, the BOP policy statement that was subsequently corrected by the OLC Memorandum was not subject to the notice and comment provisions of the APA.

　　　　The First Circuit's decision in Warder further establishes that the change in BOP policy is not subject to notice and comment.  Warder, 149 F.3d 73 (1st Cir.1998).  Warder involved an administrative ruling that was issued by the Secretary of Health and Human Services.  The ruling stated that certain equipment fell within the statutory definition of "durable medical equipment," and was therefore not reimbursable under Medicare.  Id. at 76.  The court held that the administrative ruling was interpretive and not legislative because the agency interpretation was clearly within the parameters set out by the statute.  Id. at 80-81.  The section of the OLC Memorandum that is at issue in this case is analogous to the administrative ruling in Warder because it involves an interpretation of the law that is clearly dictated by the governing statute.

　　　　The footnote within the OLC Memorandum that addresses section 3624(c) is akin to a Program Statement because it provides guidance to the agency on how to interpret its statutory mandate.  The BOP's interpretation of section 3624(c) does not change the existing statute or

create any new obligations. Rather, it is a permissive reading of the plain language of the statute. Agencies are generally required to interpret and implement statutory mandates. See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1981). In the instant case, the agency has adopted an interpretation that is clearly within the letter of the law as it is exactly the letter of the law.

Moreover, Chevron makes clear that a change, or even a reversal, in policy does not render agency action invalid under the APA. 467 U.S. at 863-64 ("[a]n initial agency interpretation is not instantly carved in stone" and "the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis"). A reversal in policy is accorded deference if an agency supplies "a reasoned analysis for the change." Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29, 42 (1983). The reasoned analysis for BOP's procedure change was provided in OLC's memorandum of December 13, 2002.

The OLC Memorandum serves to reinforce the agency's congressional mandate by giving effect to the clearly stated will of Congress. The statute unambiguously states that prisoners are to spend no more than the last ten percent of their sentences in a CCC, not to exceed six months. This agency reinforcement of the statutory language is not subject to the notice and comment period that is required by section 553 of the APA because it is an interpretive memorandum. Unlike legislative rules that are subject to section 553 of the APA, the OLC Memorandum does not create any new law or change the existing regulation in any meaningful way. The BOP's interpretation is permissible because it is clearly within the letter of the law and as such, it can be afforded some deference. Therefore, because there is no violation

of the APA, the Plaintiff's claim must be dismissed.

C.      **The New BOP Policy Does Not Implicate the Ex Post Facto Clause.**

The Plaintiff's claim that the BOP policy is in violation of the Ex Post Facto clause of the United States Constitution is flawed. The Ex Post Facto clause states, "No Bill of Attainder or ex post facto Law shall be passed." U.S. Const. Art. 1, § 9, cl. 3.  A legislative action violates the Ex Post Facto clause when it creates a crime that did not exist at the time of punishment or increases the punishment of an already established crime.  See Garner v. Jones, 529 U.S. 244, 249-250 (2000); Lynce v. Mathis, 519 U.S. 433, 441 (1997).

The new BOP policy did not violate the Ex Post Facto clause because it did not change section 3624(c).  The OLC Memorandum offered an interpretation of the existing statute in order to correct any erroneous interpretations of the statute.  This type of administrative action has been determined to not be a violation of the Ex Post Facto clause.  See Metheny v. Hammonds, 216 F. 3d 1307, 1310-1311 (11th Cir. 2000) (collecting cases); cert. denied, 531 U.S. 1196, (2001).[3]

The Ex Post Facto clause does not forbid the correction of the misinterpretation of an existing statute even if the correction would serve to disadvantage one who relies on the misinterpretation.  Stephens v. Thomas, 19 F.3d 498, 500 (10th Cir. 1994); cert. denied, 513 U.S. 1002 (1994) (concluding no Ex Post Facto violation when department of corrections stopped applying good-time-credit statute to prisoners with life sentences when state attorney general informed department that this application was prohibited by statute).

---

[3] Judge Stearns in Rothberg (discussed in this memorandum at page 9) states that "a constitutional violation cannot arise from the correction of an erroneous interpretation of an otherwise valid law." Rothberg at 2.

Further, the actual sentence that the Plaintiff was given has not changed.  Any subjective expectation that he may have had that he would serve about a fifth of his sentence in a community corrections facility does not amount to a change in his punishment.  In Dominique v. Weld, 73 F.3d 1156 (1st. Cir. 1996), the court held that changes in policies that resulted in an inmate's termination from a work-release program did not increase the inmate's punishment in violation of the Ex Post Facto clause.  73 F. 3d 1161-62.  In fact, the Dominique court found that the change of the conditions of confinement at issue did not even implicate the Ex Post Facto clause.  Id. at 1163.

Plaintiff's punishment has not been increased or changed.  Only the conditions of his confinement will change.  There is nothing retroactive about the application of the existing law to the Plaintiff's sentence.  He has not been removed from community confinement and placed back into FMC Devens.  His final release date is and has always remained the same.  Therefore, based on these facts and the existing law, the Plaintiff's Ex Post Facto claim must be dismissed.

D.     **The New BOP Policy Does Not Violate the Due Process Clause.**

The BOP policy does not violate the Due Process clause of the United States Constitution.  In Sandin v. Conner, 515 U.S. 472 (1995), the Supreme Court held that liberty interests implicated by the Due Process clause of the Constitution will generally be limited to freedoms from restraint that are "atypical" or that pose a "significant hardship on the inmate in relation to the ordinary incidents of prison life."  Sandin, 515 U.S. at 484.  Limiting the Petitioner's transfer to a CCC to the statutory maximum of 10% of his prison term can be characterized as typical and not an "atypical" part of the prisoner's punishment, and certainly does not pose a "significant hardship" on him.

It is well established that federal prisoners do not have a protected liberty interest in CCC placement, and that the Bureau of Prisons has complete and absolute discretion in the determination of halfway house placement. United States v. Laughlin, 933 F. 2d 786 (9th Cir. 1991); U.S. v. Morales-Morales, 985 F. Supp. 229, 230 -231 (D.P.R.1997). In general, prisoners do not have "inherent liberty interests in particular modes, places, or features of confinement or custody." Asquith v. Department of Correction, 186 F.3d 407, 410 (3rd Cir. 1999). Further, the Second Circuit noted that section 3624(c) does not require the BOP to even ensure that all prisoners participate in community confinement programs, and that the statute merely requires the BOP to place prisoners into such programs if it is "practicable." United States v. Restrepo, 999 F.2d 640, 645 (2d Cir. 1993); see also Morales-Morales, at 231 (court was without jurisdiction "to designate the manner and place of defendant's pre-release custody.").

In this case, the Plaintiff's liberty interests as established by the Due Process clause have not been violated. The Plaintiff has no right to a particular placement for the purposes of his confinement. Asquith, 186 F.3d at 410. In fact, the statutorily designated 10% of his sentence that could possibly be spent in community corrections is not mandated, but only allowed "if practicable." Restrepo, 999 F.2d at 645. Thus, Plaintiff's claim to a liberty interest is meritless, as no such interest has been created by the statute or exists as a matter of Constitutional law.[4]

Moreover, there is no evidence within the record that indicates that the Plaintiff was ever recommended for a CCC placement beyond the statutorily required ten percent. To the contrary,

---

[4] This Court's suggestion in Monahan that there is a due process right not to be sentenced on false information is not implicated here, as nothing about Stern's sentence, one made at the minimum of the guideline range, appears to have had anything to do with any CCC expectation.

the record indicates that CCC placement was planned for the statutorily set date, December 21, 2004. Ward Dec., Exs. G and I. Plaintiff read and signed these reports. Id. As such, Plaintiff's claim must be dismissed.

## CONCLUSION

For the foregoing reasons, the Plaintiff's Complaint fails to state a claim upon which relief can

be granted, and, accordingly it should be dismissed.

          Respectfully submitted,

          DAVID WINN

          By his attorney

          MICHAEL J. SULLIVAN
          UNITED STATES ATTORNEY

Dated: May 24, 2004          By:  /s/ Jeremy Sternberg
          Jeremy M. Sternberg
          Assistant U.S. Attorney
          1 Courthouse Way, Suite 9200
          Boston, MA 02210
          (617) 748-3100

Certificate of Service

    I hereby certify that on May 24, 2004, I caused a copy of this pleading to be sent by U.S. Mail to David G. Stern, Reg. No. 23799-038, Unit I (Camp), Federal Medical Center, Devens, P.O. Box 879, Ayer, MA 01432.

          /s/ Jeremy Sternberg
          Jeremy M. Sternberg
          Assistant U.S. Attorney